

**LORI S. SIMPSON**
**U.S. BANKRUPTCY JUDGE**

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### Greenbelt Division

| | | |
|---|---|---|
| In re: | * | |
| Young Electrical Contractors, Inc., | * | Case No. 14-26373-LSS |
| Alleged Debtor, | * | Chapter 7 |
| | * | (Involuntary) |
| | * | |

### <u>MEMORANDUM OPINION</u>

Before the Court is the Motion to Dismiss Involuntary Petition [Dkt. No. 6] (the "Motion to Dismiss") filed by petitioning creditors, Electrical Workers Local No. 26 Pension Trust Fund, Electrical Welfare Trust Fund, Electrical Local No. 26 Joint Apprenticeship and Training Trust Fund, Electrical Workers Local No. 26 Individual Account Fund and The National Electrical Benefit Fund National Electrical Contractors Association (the "Petitioning Creditors"), and the Opposition to the Motion to Dismiss [Dkt. No. 9] (the "Opposition") filed by Alleged Debtor, Young Electrical Contractors, Inc. ("YEC"). Pursuant to the parties' agreement, the Court held a hearing on August 20-21, 2018 on the sole issue of whether the Petitioning Creditors filed the Involuntary Petition [Dkt. No. 1] (the "Involuntary Petition") in this case in bad faith, with further hearings to be set if needed. At the conclusion of the hearing, the Court requested that the parties submit post-hearing briefs in lieu of closing argument. Following the submission of

briefs, the Court took the matter under advisement.  While Petitioning Creditors have requested an opportunity to present further argument orally, the Court has determined that no further argument is necessary on the issue of bad faith as the legal issues were adequately presented at the hearing and in the post-hearing briefs.  For the reasons that follow, the Court finds and concludes that Petitioning Creditors filed the Involuntary Petition in bad faith.

This Court has jurisdiction to hear this matter, pursuant to 28 U.S.C. § 157 and 28 U.S.C. § 1334. This is a core proceeding, pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this district pursuant to 28 U.S.C. § 1409(a). The following constitutes the Court's Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52, made applicable to this contested matter by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure. To the extent appropriate, the following findings of fact shall be deemed conclusions of law and *vice versa*.

## I.      Findings of Fact

### A.      *The Parties.*

YEC is in the business of acting as the electrical subcontractor on large construction projects.  YEC's president is Cathy Young and Steve Young is its Vice President.  Ms. and Mr. Young hold a 51% and 49% interest in the company, respectively.  Prior to September 8, 2014, YEC operated out of a warehouse located at 10011 Washington Boulevard, Laurel, Maryland (the "Laurel Property").  YEC obtains business by submitting bids to general contractors. Typically, YEC's subcontracts include a payment schedule tied to the completion percentage for work it agrees to perform under a given subcontract.  YEC customarily receives payments within 30-60 days after reaching a benchmark completion percentage.

For the period relevant to this matter, YEC worked exclusively on government projects and obtained labor exclusively from union members, including members with International Brotherhood of Electrical Workers Local No. 26 in Baltimore and the International Brotherhood of Electrical Workers Local No. 24 in the Washington D.C. metropolitan area. As a government subcontractor, YEC was obligated to maintain surety bonds for performance and payment. In 2000, YEC began obtaining bonds from Berkley Surety Group ("Berkley") that guaranteed YEC's performance of its subcontracts and payment to its labor and material providers. Since 2000, YEC obtained 49 bonds from Berkley totaling $103,000,000.00. Additionally, YEC maintained a "union" bond of $40,000.00 (the "Union Bond") with a Berkley subsidiary, Carolina Casualty Insurance Company.

Petitioning Creditors are collectively bargained multi-employer benefit funds. Petitioning Creditors hold funds in trust for the payment of benefits and related administrative expenses for members of the International Brotherhood of Electrical Workers Local No. 26. A central administrative office processes all payments to Petitioning Creditors. Julie Linkins is responsible for tracking payments to the Petitioning Creditors and reporting delinquencies to a committee charged with collection of unpaid contributions (the "Collection Committee"). The Collection Committee held monthly meetings to discuss the status of outstanding accounts. Pursuant to a collective bargaining agreement (the "CBA") between Petitioning Creditors and YEC, YEC was required to pay monthly contributions to Petitioning Creditors during the period relevant to this matter.[1] The amount due varied from month to month and was due on the last day of the following month.

---

[1] Petitioning Creditors are separate and distinct entities. However, one administrative office administers the trusts on behalf of the separate entities and their respective boards of trustees. Further, that office processes all contributions to all of the Petitioning Creditors. For the sake of simplifying the discussion

### B.    Background.

From its inception in 1989, YEC experienced decades as a successful electrical contractor. However, YEC began experiencing financial difficulties in 2013 caused by extended delays in payment from its general contractors.  In turn, YEC did not make its mandatory contributions to Petitioning Creditors for June through September 2013, accumulating $243,104.49 in arrears.  Thereafter, Ms. Young requested that Petitioning Creditors allow YEC to cure that arrearage through an extended payment plan.  The Collection Committee agreed to a payment plan whereby YEC would cure the arrearage through 12 equal monthly installment payments of $20,259.00 (the "Installment Payments") in addition to the regular monthly payment.  YEC was to make the first Installment Payment on or before November 30, 2013, and future Installment Payments on or before the last day of the subsequent 11 months.

YEC made the first nine Installment Payments each month without serious incident. However, during this period YEC's financial difficulties continued and it was generally unable to pay its debts as they came due.  In light of its continuing financial difficulties, YEC was considering numerous options, including operating as a non-union contractor.  However, YEC determined that, at a minimum, it would make every effort to complete all open subcontracts. YEC got serious about reducing its operating expenses in August 2014.  On August 14, 2014, YEC canceled the Union Bond believing that it was superfluous in light of the Berkley bonds. As a further cost reduction measure, YEC relocated its offices from the Laurel Property to a smaller building located at 913 Olney Sandy Spring Road, Sandy Spring, Maryland (the "Sandy Spring Property") on September 8, 2014.  Soon thereafter, YEC informed Petitioning Creditors that it moved its offices to the Sandy Spring Property.

---

in this Memorandum Opinion, the Court will refer to the Petitioning Creditors and the administrative office as simply Petitioning Creditors.

At the same time, YEC approached Berkley seeking financial assistance so that it could continue operations to at least complete all open subcontracts.  Consequently, Berkley investigated YEC's financial position, including claims that YEC may have against certain contractors.  Berkley concluded that, while YEC's cash-flow situation was concerning, it was in Berkley's best interest for YEC to continue operations.  YEC and Berkley agreed that YEC would remain in control of its business with Berkley providing operating capital when necessary.  YEC would then remit any payments it received for work performed to Berkley.  Further, Ms. and Mr. Young agreed to assist Berkley in collecting amounts due to YEC.  Thereafter, YEC informed the Petitioning Creditors that Berkley would be making future Installment Payments and regular monthly payments on YEC's behalf.

On September 17, 2014, the Collection Committee held its monthly meeting.  As of that day, YEC had not made the tenth installment payment and July 2014 regular monthly payment.  Ms. Linkins informed the Collection Committee of YEC delinquency.  The Collection Committee also discussed rumors that YEC was ceasing operations and selling the Laurel Property.  The Collection Committee directed counsel to inquire into filing an involuntary petition against YEC.  No further review of YEC's financials or assets was conducted or requested.

On September 22, 2014, Berkley made the tenth Installment Payment and July 2014 regular monthly payment on YEC's behalf.  Ms. Linkins promptly informed the Collection Committee and counsel of her receipt of the payments from Berkley.  No one acting on Petitioning Creditors' behalf inquired into the reasons for or extent of Berkley's involvement.

On September 30, 2014, Ms. Linkins sent a letter (the "Audit Letter") addressed to YEC at the Laurel Property, advising that an audit of YEC's 2013 contributions to the Petitioning

Creditors had led to a determination that YEC owed an additional $7,093.44 for that period (the "Audit Amount"). The Audit Letter advised YEC that it had thirty (30) days to appeal the decision and that the Audit Amount, if not challenged, would be due November 29, 2014.

By October 8, 2014, Petitioning Creditors had not received the eleventh Installment Payment and August 2014 regular monthly payment of $70,073.83, which were due September 30, 2014. On that day, Petition Creditors sent a letter through counsel to YEC at the Laurel Property address (the "Demand Letter"). The Petitioning Creditors demanded that YEC remit the eleventh Installment Payment and August 2014 regular monthly payment within 10 days of the Demand Letter or Petitioning Creditors would initiate collection proceedings. YEC never received the Demand Letter.

On October 14, 2014, Berkley remitted the eleventh Installment Payment and August 2014 regular monthly payment to Petitioning Creditors on YEC's behalf. Ms. Linkins promptly informed the Collection Committee that she received the payments. At that time, YEC was current on all obligations to the Petitioning Creditors through October 31, 2019, at which time the twelfth and final Installment Payment and the September 2014 regular monthly payment would become due. Neither the Collection Committee nor anyone else acting on Petitioning Creditors' behalf inquired into YEC's ability to make the October 31, 2019 payments. The Petitioning Creditors never demanded payment for liquated damages or attorney's fees based on YEC's delayed payments.

On October 23, 2014, the Petitioning Creditors filed the Involuntary Petition against YEC. By that time, Petitioning Creditors were well versed in the filing of involuntary petitions. In the preceding year, Petitioning Creditors placed no less than six other entities into involuntary bankruptcy. In spite of, or perhaps because of, this familiarity, Petitioning Creditors filed the

Involuntary Petition with no reasonable basis for doing so. YEC was not delinquent on the Installment Payments or the regular monthly payments. Petitioning Creditors did not make a reasonable inquiry into YEC financial condition or solvency. Petitioning Creditors filed the Involuntary petition to harass and intimidate YEC into remitting payments that were not due as of the petition date. While the Petitioning Creditors claim that they believed YEC was shedding assets based on the return of the Demand Letter, such claim is not reliable. The Demand Letter was sent to the Laurel Property and YEC had informed Petitioning Creditors of its move to the Sandy Spring Property. Even a perfunctory investigation would have revealed that filing the Involuntary Petition was not justified.

On November 5, 2014, Berkley remitted payment to Petitioning Creditors for the twelfth Installment Payment and YEC's September 2014 regular monthly payment. The following day, Petitioning Creditors filed the Motion to Dismiss. In the Motion to Dismiss, Petitioning Creditors incorrectly assert that YEC was in default on its obligations to Petitioning Creditors. Debtor timely filed the Opposition, requesting that the Court dismiss the Involuntary Petition and preserving its rights under 11 U.S.C. § 303(i) to seek damages against Petitioning Creditors for filing the Involuntary Petition in bad faith.

## II.    Discussion.

In addition to the generally applicable provisions of the Bankruptcy Code and Rules, involuntary bankruptcy cases are governed specifically by 11 U.S.C. § 303 and Rules 1003, 1004, 1010, 1011, 1013, and 1018 of the Federal Rules of Bankruptcy Procedure. In accordance with the parameters set forth therein, creditors may file an involuntary petition against a person or entity. *See* 11 U.S.C. § 303(b). The petitioning creditors must then serve a copy of the involuntary petition on the involuntary debtor, and the involuntary debtor has an opportunity to

file an answer in response. *See* Fed. R. Bankr. P. 1010; 11 U.S.C. 303(d). If the involuntary

debtor shows that the case should be dismissed, "the court may grant judgment against the

petitioners and in favor of the debtor for costs or a reasonable attorney's fee." 11 U.S.C. §

303(i)(1). If the debtor shows by a preponderance of the evidence that any petitioning creditor

filed the involuntary petition in bad faith, the court may award the involuntary debtor judgment

against that petitioning creditor for "damages proximately caused by such filing or punitive

damages." 11 U.S.C. § 303(i)(2); *In re Caucus Distributors, Inc.*, 106 B.R. 890, 923 (Bankr.

E.D. Va. 1989) (holding that burden of proof on the involuntary debtor is preponderance of the

evidence). The only issue presently before the Court is whether the Petitioning Creditors filed

the Involuntary Petition in bad faith.

  In *Atlas Mach. & Iron Works, Inc. v. Bethlehem Steel Corp.*, 986 F.2d 709, 716 (4th Cir.

1993), the Fourth Circuit held that "[t]o determine bad faith, a court examines whether a

reasonable person would have filed the petition (objective test) as well as the motivations of the

petitioner (subjective test)." *Id.* at 716 (*citing In re Caucus Distribs., Inc.*, 106 B.R. 890, 924

(Bankr. E.D. Va. 1989)). The Fourth Circuit went on to uphold the bankruptcy court's explicit

finding of objective bad faith based on the bankruptcy court's finding that petitioning creditor's

"decision to file the petition was unreasonable." *Id.* Further, the Fourth Circuit upheld the

bankruptcy court's implicit finding of subjective bad faith based on its finding that petitioning

creditor "filed the petition for on improper purpose," namely, "that it filed the petition to collect

the debt." *Id.* The Fourth Circuit did not explain whether the involuntary debtor must show both

objective and subjective bad faith, or if one is sufficient.

  Other courts have labeled the subjective and objective examination adopted by the Fourth

Circuit as the "totality of circumstances" approach. *See In re Forever Green Athletic Fields,*

8

*Inc.*, 804 F.3d 328, 336 (3d Cir. 2015).  In adopting the totality of circumstances approach, the Third Circuit set out the following factors for courts to consider:

> In conducting this fact-intensive review, courts may consider a number of factors, including, but not limited to, whether: the creditors satisfied the statutory criteria for filing the petition; the involuntary petition was meritorious; the creditors made a reasonable inquiry into the relevant facts and pertinent law before filing; there was evidence of preferential payments to certain creditors or of dissipation of the debtor's assets; the filing was motivated by ill will or a desire to harass; the petitioning creditors used the filing to obtain a disproportionate advantage for themselves rather than to protect against other creditors doing the same; the filing was used as a tactical advantage in pending actions; the filing was used as a substitute for customary debt-collection procedures; and the filing had suspicious timing.

*Id.*

As of the petition date, YEC was current on its obligations to Petitioning Creditors. Petitioning Creditors were aware of unsubstantiated rumors that YEC was liquidating assets and ceasing operations.  However, Petitioning Creditors were aware that Berkley had been paying YEC's debts within a reasonable time after they became due. To be sure, Petitioning Creditors had good reason to conduct a reasonable inquiry into YEC's ability to perform its future obligations.  However, Petitioning Creditors did not conduct a reasonable inquiry into the relevant facts.  There was no evidence that YEC's other creditors were obtaining a disproportionate advantage.  If anything, given YEC's financial difficulties, it appears that Petitioning Creditors may have been enjoying preferential treatment.  Petitioning Creditors had no reasonable basis to file the Involuntary Petition.  Based on the evidence before the Court, the Court draws the reasonable inference that Petitioning Creditors filed the Involuntary Petition as an overly aggressive means of collecting a debt, which had not even come due as of the petition date.  Considering the totality of circumstances, the Court finds and concludes that Petitioning Creditors' filing of the Involuntary Petition was objectively and subjectively in bad faith.

## III.    Conclusion.

Based on the foregoing, the Court finds and concludes that Petitioning Creditors filed the Involuntary Petition in bad faith as that term is used in 11 U.S.C. § 303(i)(2).  The parties shall contact the Court's courtroom deputy to discuss scheduling of the trial on damages.

cc: All parties

**End of Order**